## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| MICHAEL EDELSON, derivatively and on behalf of MERIDIAN BIOSCIENCE, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN A. KRAEUTLER, JAMES M. ANDERSON, DAVID C. PHILLIPS, DWIGHT E. ELLINGWOOD, JOHN C. MCILWRAITH, CATHERINE A. SAZDANOFF, and MELISSA A. LUEKE, <br><br> Defendants, <br><br> -and- <br><br> MERIDIAN BIOSCIENCE, INC., an Ohio Corporation, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

By and through his undersigned counsel, Plaintiff Michael Edelson ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Meridian Bioscience, Inc. ("Meridian" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, and corporate waste, from at least March 25, 2016 to the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Meridian and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Meridian's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related pending securities fraud class action, *Forman v. Meridian Bioscience, Inc., et al.*, No. 1:17-cv-00774-SJD (S.D. Ohio) (the "Securities Class Action"); and (e) review of other publicly-available information concerning Meridian and the Individual Defendants (defined below).

## I.  NATURE AND SUMMARY OF THE ACTION

1.     Meridian is a life science company engaged in developing, manufacturing, selling, and distributing clinical diagnostic test kits for certain gastrointestinal, viral, respiratory, and parasitic infectious diseases. According to the Company's website, Meridian's mission is to "***efficiently apply [its] human, scientific, and financial resources to provide innovative high value products and technologies that improve the diagnosis and treatment*** of infectious diseases and metabolic disorders."

2.      On March 24, 2016, Meridian announced that it had completed the acquisition of Magellan Biosciences, Inc. and its wholly-owned subsidiary Magellan Diagnostics, Inc. (collectively, "Magellan") (the "Magellan Acquisition").  Following the Magellan Acquisition, the Individual Defendants caused Meridian to tout Magellan as "***the leading provider of point-of-care lead testing systems***"[1] and a "***10% grower***" that was "***running ahead of expectations***…[and] ***essentially a turnkey*** for [Meridian]."

3.      Throughout the Relevant Period, the Individual Defendants caused Meridian to extol the Company's commitment to "***enabl[ing] early diagnosis and treatment of common, acute medical conditions . . . and . . . better patient outcomes***" underpinned by diagnostic products providing "***accuracy, simplicity and speed***."

4.      Notwithstanding the Individual Defendants' assurances to the investing public that one of Meridian's core products procured in the Magellan Acquisition, LeadCareII, "***exceeded expectations***" and was "***expected to contribute to revenues***" through prospective expansion into international markets, on May 17, 2017, the U.S. Food and Drug Administration (the "FDA") issued a press release warning Americans about the inaccuracy of the Company's lead tests, including LeadCareII.

5.      Indeed, in a joint press release with the Centers for Disease Control and Prevention, the FDA advised that it was "deeply concerned by [the] situation and [wa]s warning laboratories and health care professionals that they should not use any Magellan Diagnostics' lead tests with blood drawn from a vein" in light of its findings that the Company's tests for lead poisoning were potentially underestimating blood lead levels.

---

[1] Emphasis added unless otherwise noted.

6.     Despite the potentially lethal consequences of faulty lead testing, the Individual Defendants caused Meridian to report $28.1 million in revenues enabled by sales of the Company's lead testing devices, concealing the colossal pecuniary, civil, and regulatory risk Meridian assumed through its sales and marketing of its products.  These problems, as the Individual Defendants were well aware, would affect sales and revenue growth projections, making the Company's public statements false and misleading.

7.     The market reacted to the FDA's revelations with a precipitous 8% stock drop, falling $1.30 per share to close at $13.45 per share on May 17, 2017, erasing millions of dollars in market capitalization.

8.     The Meridian Board of Directors (the "Board") has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein, that were not shared with Meridian shareholders, and/or face a substantial likelihood of liability to Meridian for breaching their fiduciary duties of loyalty and good faith by authorizing or failing to correct the false and misleading statements alleged herein, and/or lack independence.  Accordingly, a pre-suit demand upon the Board was, and is, a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Meridian.

## II.     JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.     The Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that Plaintiff and defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations within, this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper under 28 U.S.C. §1391 because Meridian maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.     THE PARTIES

13.     Plaintiff is a current shareholder of Meridian stock and has continuously held shares of Meridian stock since 2008. Plaintiff resides in Georgia.

14.     Nominal Defendant Meridian is an Ohio corporation with its principal executive offices located in Cincinnati, Ohio. The Company's common stock is traded on the NASDAQ under the ticker symbol "VIVO." As of November 30, 2017, the Company has approximately 42.22 million shares outstanding.

15.     Defendant John A. Kraeutler ("Kraeutler") has been the Company's Chief Executive Officer ("CEO") since 2008 and Chairman of the Board since 2014. Prior to that, Kraeutler had been the President and Chief Operating Officer of Meridian since 1992. Kraeutler is a defendant in the Securities Class Action. Kraeutler received $1,952,900 in total compensation

- 4 -

from Meridian in 2015 and $1,358,430 in total compensation from Meridian in 2016. Kraeutler is a citizen of Ohio.

16. Defendant Melissa A. Lueke ("Lueke") has been the Company's Vice President, Chief Financial Officer, and Secretary since 2001, and was appointed Executive Vice President in 2009. Defendant Lueke is a defendant in the Securities Class Action. Lueke received $493,090 in total compensation from Meridian in 2015 and $599,053 in total compensation from Meridian in 2016. Lueke is a citizen of Kentucky.

17. Defendant James M. Anderson ("Anderson") has been a Director of the Company since 2009. Anderson received $99,551 in total compensation from Meridian in 2015 and $96,283 in total compensation from Meridian in 2016. During the Relevant Period, Anderson served as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and was the Chair of the Compensation Committee. Anderson is a citizen of Ohio.

18. Defendant David C. Phillips ("Phillips") has been a Director of the Company since 2000. Anderson received $104,051 in total compensation from Meridian in 2015 and $106,033 in total compensation from Meridian in 2016. During the Relevant Period, Anderson was the Chair of the Audit Committee and served as a member of the Compensation Committee. Phillips is a citizen of Ohio.

19. Defendant Dwight E. Ellingwood ("Ellingwood") has been a Director of the Company since 2014. Ellingwood received $89,301 in total compensation from Meridian in 2015 and $87,283 in total compensation from Meridian in 2016. During the Relevant Period, Ellingwood was the Chair of the Nominating and Corporate Governance Committee. Ellingwood is a citizen of Ohio.

20.     Defendant John C. McIlwraith ("McIlwraith") has been a Director of the Company since 2015. McIlwraith received $43,665 in total compensation from Meridian in 2015 and $82,283 in total compensation from Meridian in 2016. During the Relevant Period, McIlwraith served as a member of the Compensation committee and the Nominating and Corporate Governance Committee. McIlwraith is a citizen of Ohio.

21.     Defendant Catherine A. Sazdanoff ("Sazdanoff") has been a Director of the Company since 2015. Sazdanoff received $43,665 in total compensation from Meridian in 2015 and $78,033 in total compensation from Meridian in 2016. During the Relevant Period, Sazdanoff served as a member of the Audit committee. Sazdanoff is a citizen of Illinois.

22.     Defendants identified in ¶¶ 15-21 are sometimes referred to herein as the "Individual Defendants."

23.     Defendants identified in ¶¶ 15, 17-21 are sometimes referred to herein as the "Director Defendants."

24.     Defendants identified in ¶¶ 17-18, 21 are sometimes referred to herein as the "Audit Committee Defendants."

25.     As directors and/or officers of Meridian, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about the Company's business, operations, prospects, internal controls, and financials, including the Company's marketing and sales practices, product quality, and safety and regulatory practices because of their access to internal corporate documents and clinical data, conversations and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual

Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Meridian through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Meridian stockholders.

## IV.    FACTUAL ALLEGATIONS

26.     Meridian is a fully-integrated life science company that manufactures, markets, and distributes a broad range of innovative diagnostic test kits, purified reagents, and biopharmaceutical-enabling technologies.  According to its website, the Company's products "provide accuracy, simplicity and speed" for the early diagnosis and treatment of common medical conditions, such as infections and lead poisoning.  Meridian has strong market positions in the areas of gastrointestinal and upper respiratory infection, and blood lead level testing.

27.     Meridian's primary source of revenue is the Company's Diagnostics Segment, which provided 74% of the Company's consolidated net revenues for fiscal 2016, and 71% of the Company's consolidated net revenues for fiscal 2017.

28.     The Company's diagnostic products are used outside of the human body and require little or no special equipment.  Meridian actively markets its products to hospitals, reference laboratories, research centers, physicians' offices, and diagnostics manufacturers in more than 60 countries around the world.

29.     In early 2016, the Individual Defendants caused Meridian to vote on and consummate the acquisition of Magellan from an investor group including Ampersand Capital Partners as the majority owner, along with Abingworth, Tekla Capital Management and Boston Community Venture Fund.  The Individual Defendants caused Meridian to finance the purchase price of $66 million using a combination of cash on hand and a $60 million five-year term loan.

30.     During the Relevant Period, the Individual Defendants caused Meridian to issue statements assuring the investing public that Meridian was committed to providing "*accurate and simple-to-use tests for rapid diagnoses [which] enabl[e] appropriate treatment*," concealing the colossal pecuniary, civil, and regulatory risk Meridian assumed through sales and marketing of its lead tests.  These problems, as the Individual Defendants were well aware, would affect sales and revenue-growth projections, making the Company's public statements false and misleading.

## V.     THE INDIVIDUAL DEFENDANTS CAUSED MERIDIAN TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

31.     Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, and failed to disclose material adverse facts about the Company's business, product integrity, operations, and prospects, which were known to the Individual Defendants and/or recklessly disregarded by them.

32.     On April 28, 2016, Meridian common stock was trading as high as $21.49 per share in intraday trading.

33.     On March 24, 2016, the Individual Defendants caused Meridian to file a Form 8-K with the SEC announcing it had consummated the Magellan Acquisition.  The Form 8-K incorporated by reference a press release issued by the Company the same day, which touted Magellan as a "pioneer" of FDA-cleared products for the testing of blood to diagnose lead poisoning in children and adults.  The press release stated, in pertinent part:

> Today, Magellan is the leading provider of point-of-care lead testing systems with placements in more than 6,500 physician offices and clinics nationwide.  Its position in pediatric offices is particularly strong.  *LeadCare® II, the only CLIA-waived lead testing system, enables physician practices to enhance the quality of care, improve patient compliance and convenience, and reduce costs*.  Magellan's LeadCare Ultra® and Plus® systems are designed for use in hospitals and reference labs.

- 8 -

*Magellan has a robust product development pipeline* and plans to introduce a third generation platform *that will include a menu of additional high value CLIA-waived pediatric tests including, but not limited to, lead testing*. Magellan's talented team of executives and employees led by Amy Winslow, President and Chief Executive Officer of Magellan, will continue to manage the business, which will remain in its current location and facility.

From a strategic perspective, *the acquisition of Magellan provides* (i) an important point-of-care capability, (ii) *ready-made access and expansion of certain of Meridian's products into the pediatric market*, (iii) expansion of Magellan's products into international markets where Meridian has a presence, (iv) opportunities within Meridian's hospital market as hospitals acquire physician office practices, and (v) *a new growth driver as the importance of lead testing and remediation in the United States and global community becomes better understood*.

*    *    *

John A. Kraeutler, Chairman and Chief Executive Officer of Meridian, commented, "*A key underpinning of our diagnostic growth strategies has been to address 'test and treat' opportunities by applying highly accurate and simple-to-use tests for rapid diagnoses, thereby enabling appropriate treatment. Because elevated lead levels can cause serious developmental impairment, especially in young children, the need for broad testing and fast remediation of the contaminated environment is acute. Magellan has maintained a clear focus on developing and marketing test systems that are well recognized for their accuracy and ease-of-use.* Further, the Magellan test systems are now in use by more than 10,000 pediatricians, primarily in the U.S. We believe that there is excellent growth potential in Magellan Diagnostics on its own, both with the existing products and the pending new product pipeline.

34.    On April 29, 2016, the Individual Defendants caused Meridian to file a Form 8-K with the SEC announcing its financial results for the second fiscal quarter and six months ended March 31, 2016.  The Form 8-K incorporated by reference a press release issued by the Company the same day, which stated, in pertinent part:

Finally, during the latter weeks of the quarter we completed the acquisition of Magellan Diagnostics, the market leader in blood lead testing. *Magellan achieved $16 million in revenues in the prior calendar year and is on pace for growth of 8% this year*. Lead testing has become increasingly topical due primarily to reports of contaminated public water systems.

35.     Then, on October 20, 2016, the Individual Defendants caused Meridian to file a Form 8-K with the SEC announcing its preliminary financial results for the fiscal year and fourth quarter ended September 30, 2016.  The Form 8-K incorporated by reference a press release issued by the Company the same day, which stated, in pertinent part:

**Meridian Bioscience, Inc. Comments on Preliminary Fiscal 2016 Operating Results and Provides Fiscal 2017 Revenue and Earnings Guidance**

CINCINNATI,    October 18,    2016    (GLOBE    NEWSWIRE) — Meridian Bioscience, Inc. (NASDAQ: VIVO) today announced that based on preliminary results, it expects revenues for fiscal year 2016, ended on September 30, 2016, to be approximately $196 million, an increase of 1% compared to the prior year. Diluted earnings per share are expected to be $0.75 to $0.76, including costs related to acquisition activity and costs associated with the reorganization of Diagnostics sales and marketing leadership (in the aggregate, $1.7 million after tax or $0.04 diluted earnings per share).  This compares to diluted earnings per share of $0.85 in fiscal 2015.

These preliminary results reflect fourth quarter revenues of approximately $47 million.   Our fourth quarter revenues reflect a combination of ongoing competitive pressures during the quarter within the *C. difficile* and food product families, distributor order patterns, and the timing of respiratory season stocking orders within the core diagnostics business.  Despite these negative factors, we experienced continued growth in our *H. pylori* product family and benefited from the addition of revenues from our March 2016 acquisition of Magellan Diagnostics. Life Science revenues were flat for the quarter due to a large immunoassay component order that was shipped in the third quarter versus the fourth quarter at the customer's request.  The resulting revenue shortfalls produce the shortfall in earnings compared to guidance.  ***Our recent acquisition of Magellan has gone well.  Magellan performed above revenue expectations and is expected to be a penny dilutive to earnings per share for the six months since the acquisition, also better than expected.***

\*       \*       \*

***Magellan Diagnostics, acquired in March of 2016 and included in our Diagnostics Segment, has exceeded expectations thus far.  For fiscal 2017, we are expecting low double-digit revenue growth on a normalized annual basis from continued success in placing the LeadCare II platform in the domestic market.  Expansion into international markets, including China following the recent CDFA approval of LeadCare II, is expected to contribute to revenues and may generate revenue upside.  Capitalizing on the increased awareness of lead poisoning, we also expect to begin selling into OB/GYN offices.***

36.     On November 10, 2016, the Individual Defendants caused Meridian to file a Form 8-K with the SEC announcing its financial results for the fiscal year and fourth quarter ended September 30, 2016.   The Form 8-K incorporated by reference a press release issued by the Company the same day, which stated, in pertinent part:

> ***Magellan Diagnostics, acquired in March 2016***, ***has exceeded our expectations in satisfying the demand for testing children for elevated blood lead levels***.  The focus on this topic is expected to continue as the impact of elevated levels continues to be recognized as an important cause of developmental issues in young children. Recently, ***we have introduced the Magellan products to the global markets with a very positive response***.  ***This business unit is expected to report low-double-digit organic growth in fiscal 2017 with the potential for upside performance***.

37.     On November 29, 2016, the Individual Defendants caused Meridian to file its Form 10-K for the fiscal year ended September 30, 2016 (the "2016 10-K").   Regarding the Company's Diagnostics Segment, the Individual Defendants caused the Company to state that "[Meridian's] ***diagnostic products provide accuracy, simplicity and speed***; ***enable early diagnosis and treatment of common, acute medical conditions***; ***and provide for better patient outcomes*** at reduced costs."

38.     The 2016 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that were signed by Defendants Kraeutler and Lueke, stating that the financial information contained in the 2016 10-K was accurate and disclosed all material changes to the Company's internal control over financial reporting.  In addition to being signed by Defendants Kraeutler and Lueke, the 2016 10-K was signed by Director Defendants Anderson, Ellingwood, McIlwraith, Phillips, and Sazdanoff.

39.     On December 14, 2016, the Individual Defendants caused Meridian to file its 2017 Proxy with the SEC for the Company's Annual Meeting of the Shareholders held on January 25, 2017 (the "2017 Proxy").   In the 2017 Proxy, the Individual Defendants solicited shareholder votes to, among other things, reelect Defendants Anderson, Ellingwood, Kraeutler,

McIlwraith, Phillips, and Sazdanoff to the Board, conduct an advisory vote on executive compensation, and reapprove the material terms for payment of performance-based incentive compensation under the Meridian Bioscience, Inc. 2012 Stock Incentive Plan. The Individual Defendants negligently issued materially-misleading statements with respect to these solicited votes. Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2017 Proxy.

40.     In support of reelecting Defendants Anderson, Ellingwood, Kraeutler, McIlwraith, Phillips, and Sazdanoff, the 2017 Proxy claimed that: (i) the Board was engaged in active risk-oversight of the Company, including focusing on the risk in the Company's operations and finances; and (ii) the Audit Committee exercised oversight of the Company's financial statements, and therefore the financial statements were appropriate for the Board to approve to include in the Company's Annual Report. In particular, the 2017 Proxy stated that the Board must consider risk assessment and management:

**The Board's Role in Risk Oversight**

The Board of Directors, as a whole and also at the Committee level, plays a key role in operational risk oversight at Meridian and works with management to understand the risks the Company faces, the steps that management is taking to manage those risks and the level of risk appropriate for the Company in light of its overall business strategy. The Board approves the high level strategies, financial plans and policies of Meridian, setting the tone and direction for the appropriate levels of risk-taking within the organization.

While overall responsibility for risk oversight rests with the Board, it is the Audit Committee that has been given the primary responsibility of monitoring and evaluating the adequacy of management's risk assessment and risk management practices. This role is carried out through its charter-mandated responsibilities related to Meridian's (i) overall financial risks and exposures; (ii) financial statement risks and exposures; (iii) financial reporting processes; (iv) compliance with ethics policies, such as the Code of Ethics, Employee Complaint Policy, Security Trading Policies and the Foreign Corrupt Practices Act Policy; and (v) compliance with governmental and legal regulations, including those contained within the Sarbanes-Oxley Act. The Audit Committee provides regular reports to

the full Board and works closely with management to update the full Board, as necessary, on matters identified through these Committee risk oversight roles.

41.     Regarding the Company's executive compensation, the 2017 Proxy indicated that "in recognition of completing the acquisition of Magellan, a number of employees, including four [Named Executive Officers] were granted time-based stock options vesting 25% per year."

42.     The 2017 Proxy also incorporated by reference the 2016 10-K, which stated that "[Meridian's] diagnostic products provide accuracy, simplicity and speed; enable early diagnosis and treatment of common, acute medical conditions; and provide for better patient outcomes at reduced costs."

43.     In a press release issued January 25, 2017, the Individual Defendants caused Meridian to reveal its negative first quarter 2017 and 2016 fiscal year financial results, amend its formerly-issued revenue forecast for the 2017 fiscal year downwards, and state that the Board had reduced the annual indicated dividend rate (the "January 25, 2017 Press Release").  Kraeutler ascribed the negative quarterly results to revenue declines in Meridian's Americas diagnostic business, Meridian's largest profit driver, across all major product categories, "due to customer buying patterns and general weakness overall."  Notably, the Individual Defendants continued to tout the Magellan business unit as yielding a "strong performance" and indicated they were "very pleased with the trends in . . . [the Company's] Magellan Diagnostics business unit[]."  The January 25, 2017 Press Release failed to disclose any information about quality deficiencies or regulatory investigations involving the Company's lead tests, and continued to extol the Company's diagnostic tests as "provid[ing] accuracy, simplicity and speed in the early diagnosis and treatment of common medical conditions, such as infections and lead poisoning."

44.     Following this news, Meridian stock dropped during intraday trading on January 25, 2017, by 22%, to close at $12.80 per share.

45. On April 27, 2017, the Individual Defendants caused Meridian to file a Form 8-K with the SEC announcing its financial results for the fiscal quarter ended March 31, 2017. The Form 8-K incorporated by reference a press release issued by the Company the same day, which assuaged any market concern following the January 25, 2017 Press Release by announcing record revenues of $16.4 million and 20% growth (the "April 27, 2017 Press Release"). The April 27, 2017 Press Release stated, in pertinent part: ". . .[Magellan] revenues increased 17%. . .we are encouraged by this quarter's revenues and net earnings [and] look forward to reporting more progress on our growth initiatives. . ."

46. Throughout the Relevant Period, the Individual Defendants' concealment of the truth regarding the lead tests, as well as the false and misleading statements made by them or which they caused the Company to make regarding the Company's business, operations, and prospects caused the Company's stock to trade at artificially-inflated prices throughout the Relevant Period, with the common stock reaching a high of $21.49 per share on April 28, 2016.

## VI. REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER

47. The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

a. the Company was knowingly selling lead tests which were inaccurate and exposed the Company to colossal pecuniary, civil, and regulatory risk;

b. Meridian's marketing and sales of its lead tests directly contradicted the Company's purported commitment to delivering "*highly accurate*" tests for "rapid diagnoses [which] enable[] appropriate treatment," exposing Meridian to potential civil liability and reputational harm;

c. the Individual Defendants' repeated claims that the Magellan product portfolio, which included Magellan's lead tests, was a "*10% grower*," in tandem with their strong assurances that high-value products that enable improved and accurate diagnoses were central tenets in Meridian's business operations, concealed from the investing public the enormous risk Meridian assumed through its sales and marketing of its lead tests; and

d. as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

48. As a result of the Individual Defendants' false and misleading statements and omissions, Meridian shares traded at artificially-inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing millions of dollars market capitalization.

## VII.   THE TRUTH EMERGES

49. On May 17, 2017, just weeks after the Company touted Magellan's increased revenues in the April 27, 2017 Press Release, the FDA issued a press release cautioning Americans about the inaccuracy of the Company's lead tests:

> *The U.S. Food and Drug Administration and Centers for Disease Control and Prevention are warning Americans that certain lead tests manufactured by Magellan Diagnostics may provide inaccurate results for some children and adults in the United States.* The CDC recommends that parents of children younger than six years (72 months) of age, and currently pregnant women and nursing mothers who have been tested for lead exposure consult a health care professional about whether they should be retested.
>
> *"The FDA is deeply concerned by this situation and is warning laboratories and health care professionals that they should not use any Magellan Diagnostics' lead tests with blood drawn from a vein,"* said Jeffrey Shuren, M.D., director of the FDA's Center for Devices and Radiological Health. "The agency is aggressively investigating this complicated issue to determine the cause of the inaccurate results and working with the CDC and other public health partners to address the problem as quickly as possible."

The FDA's warning is based on currently available data that indicate Magellan lead tests, when performed on blood drawn from a vein, may provide results that are lower than the actual level of lead in the blood. Currently, the FDA believes the issue may date back to 2014. The warning includes all four of Magellan Diagnostics' lead testing systems: LeadCare; LeadCare II; LeadCare Plus; and LeadCare Ultra. At this time, all LeadCare systems can be used with blood from a finger or heel stick, including the LeadCare II system - a system found in many doctors' offices and clinics. In addition, some laboratories offer other methods of lead testing, which are not believed to be affected at this time.

***The CDC is recommending that health care professionals retest children younger than six years (72 months) of age at the time of this alert (May 17, 2017) if their test was conducted using blood drawn from a vein using any Magellan Diagnostics' LeadCare System*** tests and received a result of less than 10 micrograms per deciliter (μg/dL). The CDC also recommends that women, who are currently pregnant or nursing and were tested in this manner while pregnant or nursing, get retested. Other adults who are concerned about their risk or the risk to an older child should speak to their health care professional about whether they should be retested.

"We understand that parents of children and others affected by this problem will be concerned about what this means for their health," said Patrick Breysse, Ph.D., director of the CDC's National Center for Environmental Health. "While most children likely received an accurate test result, it is important to identify those whose exposure was missed, or underestimated, so that they can receive proper care. For this reason, because every child's health is important, the CDC recommends that those at greatest risk be retested."

Lead exposure can affect nearly every system in the body, produces no obvious symptoms, and frequently goes unrecognized, potentially leading to serious health issues. ***Lead poisoning is particularly dangerous to infants and young children***. While recommendations for lead screening differ from state to state, all states require children to be screened for lead exposure. Some adults are also at risk for lead exposure, including those who work around products or materials that contain lead.

The FDA, an agency within the U.S. Department of Health and Human Services, promotes and protects the public health by, among other things, assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

CDC works 24/7 protecting America's health, safety and security. Whether diseases start at home or abroad, are curable or preventable, chronic or acute, stem

from human error or deliberate attack, CDC is committed to respond to America's most pressing health challenges.

50.     On this news, the price per share of Meridian's common stock fell $1.30, or over 8%, to close at $13.45 per share on May 17, 2017.

51.     On May 22, 2017, at the UBS Global Healthcare Conference, Defendant Kraeutler disclosed that the Individual Defendants were aware of potential problems associated with its blood lead tests *as early as 2014*:

> [T]he news that came out of Magellan, one of our subsidies last week, was a little disconcerting. ***We had, in 2014, before we own Magellan, we'd advised the FDA that when testing for blood lead, blood collected in a Vacutainer tube could cause problems and we put a remedial step in there.***
>
> If you look at lead testing across the United States, most of it is done by fingerstick or heelstick, none of that has been affected by this. ***But the FDA believes that the data that is supporting the remedial step on venous blood is insufficient.*** So we have agreed with them that we will continue to work together and we will begin to move those customers that were using tubed blood to fingerstick.

52.     Then, on July 13, 2017, the FDA issued a statement entitled "Alberto Gutierrez, Ph.D., Director, Office of In Vitro Diagnostics and Radiological Health, FDA's Center for Devices and Radiological Health on the status of FDA's investigation into inaccurate results from certain lead tests," citing objectionable conditions it observed during an inspection of the Company's lead test facility:

> On May 17, the U.S. Food and Drug Administration warned Americans that Magellan Diagnostics' LeadCare test systems performed on blood drawn from the vein (venous) may provide inaccurate results.
>
> At that time, our first priority was to warn laboratories, health care professionals and people who may have been impacted by this issue. We also launched an aggressive investigation to determine the cause of the inaccurate results and promised to continue to communicate as we learned more about the issue.
>
> As part of our investigation, we inspected Magellan Diagnostics' facility in North Billerica, Massachusetts. Today, we are releasing the report issued at the conclusion of the inspection, which includes several inspectional observations that may be violations of federal law. We are carefully reviewing the evidence collected

during the inspection to determine if there have been violations of federal law and whether further action is warranted.

The FDA takes these observations and the risks these tests may have posed to patients very seriously and continues to encourage people to follow the FDA's and Centers for Disease Control and Prevention's recommendations from May 17.

As we continue our investigation into the cause of the inaccurate results, the FDA will continue to provide updates on our findings and any changes to our recommendations.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

53.    The same day, the FDA issued Meridian a Form 483 for observations it made during its inspection. An FDA Form 483 is issued to company management at the conclusion of an FDA inspection when an FDA investigator has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic ("FD&C") Act and related Acts.

54.    On July 27, 2017, PiperJaffray published a report entitled "Underweight: FDA Releases Magellan Observation Summary; Our Thoughts on the Matter." The report cited nine observations found by the FDA in its investigation observation summary "ranging from design validation, risk documentation, [Standard Operating Procedures] for corrective/preventative actions as well as failure to report design changes and customer complaints to FDA" and noted that the FDA was reviewing evidence to "determine if there have been violations of federal law and whether further action is warranted."

55.    Then, on October 23, 2017, the FDA issued a warning letter to the Company ("October 23, 2017 FDA Warning Letter"), revealing, *inter alia*, that Magellan's LeadCareII and LeadCare Ultra Systems were adulterated under Section 501(f)(1)(B) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §351(f)(1)(B), because the Company firm did not have an approved

application for premarket approval ("PMA") to introduce the tests into commercial distribution. The warning letter also cited the LeadCare Ultra System's "potential for falsely low and falsely high test results" and warned that failure to take immediate corrective action could result in regulatory action by the FDA including, but not limited to, seizure, injunction, and civil money penalties.

56.    On this news, the price of Meridian common and preferred stock dropped precipitously, with the common stock trading as low as $14.45 per share in intraday trading on October 24, 2017, and closing down more than $.70 per share, a more than 4% decline from its close of $15.20 per share on October 23, 2017.

## VIII.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

57.    By reason of their positions as officers, directors, and/or fiduciaries of Meridian, and because of their ability to control the business and corporate affairs of Meridian, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Meridian in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Meridian and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

58.    Each director and officer of the Company owes to Meridian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

59.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Meridian, were able to, and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Meridian, each of the Individual Defendants had knowledge of material, non-public information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

60.     To discharge their duties, the officers and directors of Meridian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Meridian were required to, among other things:

a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Audit Committee Duties**

61.     In addition to these duties, the members of the Audit Committee owed specific duties to Meridian under the Audit Committee's Charter, including duties to review and approve

quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

62.     Specifically, according to the Company's Audit Committee Charter, the Audit Committee has primary responsibilities to:

- Review the Company's annual financial statements, financial press releases, and any reports or other financial information submitted to the SEC, including any certification, report, opinion, or review rendered by the independent accountants. This information should be sent to the Committee at least 24 hours before filing or release;

- Discuss with management and the independent public accountants the Company's risk assessment and management policies and procedures relating to the financial statements and the financial reporting process and conduct an inquiry of management and the independent public accountants regarding any significant business or financial risks and exposures;

- Oversee risks and exposures relating to the financial statements and the financial reporting process and the Company's policies and procedures for monitoring and mitigating such risks and exposures;

- Prepare a Report of the Audit Committee, or such other disclosure, that complies with federal securities laws and any applicable stock exchange or other listing standards for transmission to shareholders through the annual Proxy Statement;

- Review with management and the Company's counsel, any legal or regulatory matter that could have a significant impact on the Company's financial statements, with significant legal matters considered to be those with potential exposure of greater than $500,000;

- Periodically consult with the independent public accountants out of the presence of management about internal controls, the fullness and accuracy of the Company's financial statements, and the adequacy/capability of financial staff given the business and changes in operations; and

- Discuss with the independent accountants any major risk areas, critical accounting policies employed by the Company and any preferred accounting policies that differ from those being employed by the Company.

63.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**C.     Control, Access, and Authority**

64.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Meridian, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Meridian.

65.     Because of their advisory, executive, managerial, and directorial positions with Meridian, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Meridian.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Meridian, and was at all times acting within the course and scope of such agency.

**D.     Reasonable and Prudent Supervision**

67.     To discharge their duties, the officers and directors of Meridian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Meridian were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        c.        properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

        d.        remain informed as to how Meridian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

        e.        ensure that Meridian was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## IX.      BREACHES OF DUTIES

68.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to Meridian and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Meridian, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Meridian, the absence of good faith on their part, and a reckless disregard for their duties to Meridian and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Meridian.

69.    The Individual Defendants each breached their duties of loyalty and good faith by issuing, or causing the Company to issue, false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

## X.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

72.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

73.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XI. DAMAGES TO MERIDIAN

75. As a result of the Individual Defendants' wrongful conduct, Meridian disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Meridian's credibility. Additionally, Meridian is the subject of the Securities Class Action. Meridian has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

76. As a direct and proximate result of the Individual Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

77. Further, as a direct and proximate result of the Individual Defendants' conduct, Meridian has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

      a. costs incurred in investigating and defending Meridian and certain officers in the Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

      b. costs incurred in connection with addressing the concerns raised in the October 23, 2017 FDA Warning Letter regarding Magellan's LeadCareII and LeadCare Ultra Systems, and any fallout therefrom, including, but not limited to, civil money penalties as well as revenues lost due to the FDA warning;

      c. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially-inflated stock price; and

d.      costs incurred from the loss of the Company's customers' confidence in Meridian and its products.

78.      Moreover, these actions have irreparably damaged the Company's corporate image and goodwill.  For at least the foreseeable future, Meridian will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Meridian has also suffered a loss of more than ***$280 million dollars in market capitalization*** as a direct result of the Individual Defendants' wrongdoing alleged herein.

## XII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.      Plaintiff brings this action derivatively in the right and for the benefit of Meridian to redress injuries suffered, and to be suffered, by Meridian, as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Meridian is named as a nominal defendant solely in a derivative capacity.

80.      Plaintiff will adequately and fairly represent the interests of Meridian in enforcing and prosecuting its rights.

81.      Plaintiff has continuously been a Meridian shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein. Specifically, Plaintiff has continuously been a shareholder of Meridian since 2008.

82.      Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

83.      Plaintiff has not made any demand on shareholders of Meridian to institute this action since such demand would be a futile and useless act for the following reasons:

a.      Meridian is a publicly-traded company with thousands of shareholders of record;

b.      making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Meridian shareholders; and

c.      making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

84.      The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties to Meridian.  Plaintiff, as a shareholder of Meridian, seeks damages and other relief on behalf of the Company, in an amount to be proven at trial.

85.      At the time this action was commenced, the Board of Meridian consisted of the following six (6) directors: Director Defendants Kraeutler, Anderson, Phillips, Ellingwood, McIlwraith, and Sazdanoff.

**A.      Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability in Connection with the Company's Pervasive Misconduct**

86.      The Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith and other misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such, had fiduciary duties to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

87.      Indeed, the Director Defendants were responsible for reviewing and approving the Company's financial statements.   By authorizing the false financial statements and public

statements alleged herein filed with the SEC during the Relevant Period, the Director Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon the Director Defendants to bring suit against themselves would be a useless and futile act.

88.     The Director Defendants caused and/or allowed the Company to engage in deliberately issuing false and misleading statements to mislead investors, and each of the Director Defendants face a substantial likelihood of liability for causing Meridian to engage in such illegal and unlawful conduct.  As is described above, the Director Defendants either knew, or were reckless in not knowing, that the Company's marketing and sales practices, product quality, and safety and regulatory practices exposed investors to colossal pecuniary loss and regulatory and legal risks.  The business judgment rule protects a wide variety of business decisions but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.

89.     As a result of the alleged misconduct described above, Defendants Kraeutler, Anderson, Phillips, Ellingwood, McIlwraith, and Sazdanoff (i.e., the whole Board) face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.  Moreover, this conduct is not entitled to the protections of the business judgment rule, which also independently excuses demand.

90.     Additionally, the Director Defendants were specifically responsible for ensuring Meridian had adequate internal controls regarding the Company's compliance with federal and state rules and regulations regarding its business practices.  Thus, the Director Defendants are

directly responsible for Meridian' failure to adopt and implement such internal controls, and for the substantial damages Meridian is subject to in the ongoing lawsuits. As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein. Demand is therefore futile.

91.     Further, the Director Defendants specifically voted on, and caused the Company to consummate, the Magellan Acquisition, exposing the Company to pecuniary, regulatory, and legal risks through acquisition and sales of Magellan's lead tests.

92.     Further, Director Director Defendants Kraeutler, Anderson, Phillips, Ellingwood, McIlwraith, and Sazdanoff each signed the false and misleading 2016 10-K. The 2016 10-K was false and misleading because, *inter alia*, it touted Meridian's diagnostic products as "***provid[ing] accuracy, simplicity and speed***; ***enable early diagnosis and treatment of common, acute medical conditions***; ***and provide for better patient outcomes*** at reduced costs," which statements the Director Defendants either knew, or were reckless in not knowing, when made, were materially false and misleading or omitted material facts to make such statements not false and misleading. As a result, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

93.     Indeed, the Director Defendants, knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements, throughout the Relevant Period, that caused the Company's stock to trade at artificially-inflated prices.

94.     Moreover, the Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach

their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound, business judgment would view this exchange of consideration for services rendered as fair or reasonable.

95. The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Meridian to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**B.  Demand is Futile as to the Audit Committee Defendants**

96. During the Relevant Period, Defendants Anderson, Phillips, and Sazdanoff served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were specifically responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially-misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal

controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**C.      Demand is Futile as to Kraeutler for Additional Reasons**

97.      In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Defendant Kraeutler because he is not an independent director.

98.      Defendant Kraeutler also cannot disinterestedly consider a demand to bring suit against himself because he is named as a defendant in the Securities Class Action, which alleges he made many of the same misstatements described above in violation of the federal securities laws. Thus, if Kraeutler were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action. Kraeutler will not do this.

**COUNT I**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT**

99.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation of fraud.

100.      Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides:

"[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title [15 U.S.C. § 78l]."

101.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

102.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.

103.     The Company's 2017 Proxy violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that the Company: (i) lacked sufficient compliance, review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was aware of existing material risks that could affect the Company; and (iii) failed to maintain adequate risk management practices.

104.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the 2017 Proxy were materially misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy, including, but not limited to, election of directors, executive compensation, and the material terms for payment of performance-based incentive compensation.

105.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy.

**COUNT II**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTIES**

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Individual Defendants owed, and owe, Meridian fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Meridian the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

108.    In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders, and not to act in furtherance of their own self-interests.

109.    As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Meridian disseminated accurate, truthful, and complete information to its shareholders.

110.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

111.    The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.    Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's disclosures were complete and accurate, and, when put on notice of problems with the Company's business

practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

113.     As executive officers of Meridian and members of the Meridian Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein.  Each of them had knowledge of, actively participated in, and/or approved of, or acquiesced in, the wrongdoings alleged herein, or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected Meridian to unreasonable risks of loss and expenses.

114.     Yet, the Individual Defendants willfully ignored the obvious and pervasive problems with Meridian's marketing and sales practices, product quality, and safety and regulatory practices, and failed to make a good faith effort to correct the problems or prevent their recurrence.

115.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Meridian has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

116.     By reason of the foregoing, Meridian was damaged.

117.     Plaintiff, on behalf of Meridian, has no adequate remedy at law.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

118.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Meridian.

120. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Meridian.

121. Plaintiff, as a shareholder and representative of Meridian, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

122. By reason of the foregoing, Meridian was damaged.

123. Plaintiff, on behalf of Meridian, has no adequate remedy at law.

## COUNT IV

## AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

124. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Meridian' internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

126. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

127. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128. By reason of the foregoing, Meridian was damaged.

129. Plaintiff, on behalf of Meridian, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B. Directing Meridian to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Meridian and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Meridian directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Meridian to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.    Awarding to Meridian restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  December 6, 2017                    **LANDSKRONER GRIECO MERRIMAN, LLC**

*s/Paul Grieco*
PAUL GRIECO (#0064729)

1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: (216) 522-9000
Facsimile: (216) 522-9007
Email: paul@lgmlegal.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson
Kristen L. O'Connor
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonfistel.com
        kristeno@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com

*Attorneys for Plaintiff Michael Edelson*

# **VERIFICATION**

I, Michael Edelson, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: December 4, 2017

*Michael Edelson*
4BB92DD34F67497...

(Signature of Michael Edelson)